OPINION OF THE COURT
Robert F. Julian, J.
Relief Requested:
*641 The 14-year-old child (date of birth: June 28, 1988) of this marriage, Nicholas, requests that he not be exposed to environmental tobacco smoke during court-ordered visitations with his mother.
Question Presented:
Should the court take judicial notice: (1) that environmental tobacco smoke is a carcinogen; (2) that environmental tobacco smoke causes respiratory infections in children; (3) that environmental tobacco smoke causes asthma; (4) that environmental tobacco smoke causes coronary heart disease; and (5) that childhood exposure to environmental tobacco smoke causes increased risk of lung cancer.
Holding:
(1) The court takes judicial notice that environmental tobacco smoke is a carcinogen and causes lung cancer in otherwise healthy nonsmokers and that the children of smoking parents suffer a higher incidence of respiratory infections and smaller rates of increases in lung functions. The court declines to take judicial notice of any other questions presented.
(2) The plaintiff or any other party may introduce evidence to refute this holding at a hearing or trial. Any party seeking to refute the matter judicially noticed will have the burden of proof. Each party will have the burden of proof regarding any proposed visitation scheme that they propound.
(3) Pending a hearing or trial the defendant’s house where the child spends the majority of his time will remain a smoke-free home. The plaintiff will not smoke in her home 24 hours prior to scheduled visitations. There shall be no smoking in either parties’ residence or automobile in Nicholas’ presence. All parties shall have 30 days to request a hearing/trial; if no such request is received, this further decision/second interim order shall become final.
Procedural Status
The parties stipulated to a custody/visitation plan on May 1, 2001 and May 4, 2001 that in practical application provides that the child will spend most of his time in the defendant’s home and have a schedule of visitation with the plaintiff.
Nicholas DeMatteo, the 14-year-old child of the parties’ marriage, complained to the court about his exposure to cigarette smoke when in his mother’s (the plaintiff’s) presence. Pursuant to Nicholas’ complaint the court held an in camera proceeding with him on November 5, 2001, and then issued an order direct *642 ing that all parties cease and desist from smoking in Nicholas’ presence pendente lite. Notice was given that a hearing would be held on November 14, 2001 “regarding a permanent order as it pertains to the issue of parental smoking and secondhand smoke. To be considered in the hearing is whether or not Nicholas should be obligated to be in either parties’ residence when smoking is occurring or has occurred.”
After the hearing, the court, in order to fulfill its parens patriae duty to Nicholas and in response to his complaints, conducted its own research on the health issues surrounding exposure to environmental tobacco smoke (ETS), the so-called “secondhand smoke” of which Nicholas had complained. The court issued a decision and interim order on March 20, 2002 advising the parties that they had 30 days to demand a hearing to determine if the court should take judicial notice of the articles and concepts set forth in the said decision. The court advised that if uncontested, the facts, articles, and concepts judicially noticed would be the basis for an order compelling all parties not to smoke in their homes or motor vehicles. (Johnita M.D. v David D.D., 191 Misc 2d 301 [2002].)
The plaintiff opposed the proposed judicial notice and demanded a hearing, submitting certain documentary evidence to support her position that the court should not take judicial notice of the articles, texts, and medical facts proposed in said decision and interim order. The plaintiffs submissions include testimony of physicians at trials that apparently involved litigation against tobacco companies; testimony before a committee of Congress by Representative Thomas J. Bliley of Virginia dated July 21, 1993; and medical articles. Plaintiff maintains that based upon the literature submitted the court should neither take judicial notice nor make the following proposed findings without a hearing: (1) that ETS is a carcinogen; (2) that environmental tobacco smoke causes respiratory infections in children; (3) that environmental tobacco smoke causes asthma; (4) that environmental tobacco smoke causes coronary heart disease; and (5) that childhood exposure to environmental tobacco smoke causes increased risk of lung cancer.
Facts
The hearing on November 14, 2001 explored, pendente lite, the issue of Nicholas’ exposure to ETS in response to his complaint to the court about parental smoking. The plaintiff testified that she has smoked cigarettes for some 20 years, every day, and smokes one pack of cigarettes per day.
*643 Plaintiff disputed Nicholas’ contentions that she smoked in her apartment when Nicholas is with her and that she smokes in the car in his presence. She has a two bedroom apartment with an open kitchen and dining area, a living room and a bathroom. According to the plaintiff, her bathroom vents to the outside. She testified that in the wintertime she smokes four cigarettes a day in her apartment, usually in the bathroom with the fan operating. She denied that she smoked in the bathroom while Nicholas was present in the apartment. She testified that while she “rarely” smokes in her apartment, on “occasion” she does smoke there; in nice weather she usually smokes outside. She testified that when Nicholas is with her, she smokes on the balcony of the apartment. She testified that she smokes in the car on her way to and from work, with the windows down. Nicholas testified to the contrary, alleging that plaintiff did in fact smoke both in the car and apartment when he was present.
The plaintiff testified “I do understand that, you know, studies have shown that second-hand smoke is detrimental to the health of others,” and that she had known this for years. She indicated that she made a point of not smoking in the house when Nicholas was with her and that she made a point of not smoking in the car when he was present.
The defendant and Nicholas testified that when the parties lived together there was ETS in the household as a result of the plaintiffs smoking. Nicholas is presently in good health.
At the conclusion of the hearing, the plaintiff advised the court that she would not smoke in the house or car when Nicholas is present.
The plaintiff contests all issues raised by the court in the decision and interim order, including the general proposition that ETS poses significant health risks to nonsmokers. The plaintiff has specifically asked the court to refrain from any order regarding smoking either pendente lite or permanently. Thus, the plaintiff opposes the court issuing an order consistent with her representations to the court that she will not smoke in the house or car when Nicholas is present and opposes the court’s present pendente lite order banning smoking in the child’s presence.
Discussion
The court has reviewed all literature submitted by the plaintiff in support of her general contention that ETS is not harmful and that therefore the court should not take judicial notice as proposed in the earlier interim decision and order.
*644 A trial court is obligated to follow the statutory law of the State of New York except when the same is found to be unconstitutional. (McKinney’s Cons Laws of NY, Book 1, Statutes §§ 2, 72, 73; see McKinney’s Statutes § 73, at 154 [“Where a statute violates no constitutional limitation the only function of the courts is to enforce it”]; see also Weinberg v D-M Rest. Corp., 53 NY2d 499; Matter of Strong, 289 AD2d 798 [3d Dept 2001]; Matter of McGee v Korman, 70 NY2d 225 [1987] [statutes are presumed constitutional].)
Relative to the case at bar, the New York State Legislature in 1989 passed article 13-E of the Public Health Law, stating “there is a substantial body of scientific research showing that breathing secondhand smoke is a significant health hazard for nonsmokers.” (L 1989, ch 244, § 1.) While this statute primarily deals with exposure to secondhand smoke in public places, the court’s review of the legislative Bill Jacket (the underlying documents that constitute the legislative history of the bill) demonstrates that this sentence embraces in-home/private ETS exposure, as well as exposures in public places. Indeed, based upon the contents of the Bill Jacket, the only logical conclusion is that this law declared ETS to be a significant health hazard wherever it might be encountered, while regulating exposure only in selected public places.
Article 13-E of the Public Health Law was proposed for adoption in the 1989 legislative session by former Governor Mario M. Cuomo. In support of this legislation and prior to its passage, Governor Cuomo (hereinafter the Governor), in a memorandum[1] in support of this legislation, stated:
“The hazard that smoking presents to [non] smokers has been known for some time. The Office of Technology of Assessment of the U.S. Congress in its report, Passive Smoking In the Work Place: Selected Issues (May, 1986) estimated that 314,000 deaths in the United States in 1982 were attributable to smoking.”
In the memorandum (supra), the Governor presented the following conclusions in urging the Legislature to adopt this legislation:
“Scientific studies have determined that nonsmokers face health hazards from exposure to environmental tobacco smoke. The Surgeon General of the *645 United States, in his report, Health Consequences of Involuntary Smoking (December 1986) reviewed all of the available evidence pertaining to the health effects of environmental tobacco smoke on non-smokers and concluded:
“a. Involuntary smoking is a cause of disease including lung cancer in healthy non-smokers;
“b. The children of parents who smoke compared with children of non-smoking parents have an increased frequency of respiratory infections, increased respiratory symptoms, and slightly smaller rates of increase in lung function as the lung matures.
“c. The simple separation of smokers and nonsmokers within the same air space may reduce, but does not eliminate, the exposure of non-smokers to environmental tobacco smoke.”
In its prior decision and interim order, this court proposed the 1986 Report of the Surgeon General for judicial notice. The study is further cited by both houses of the Legislature as a basis for the enactment of article 13-E of the Public Health Law, and is quoted regarding the health effect of ETS exposure in all settings.
Sponsors of article 13-E of the Public Health Law from the New York State Assembly referred to the study in the bill memorandum in support of the legislation:[2] “Scientific studies have determined that nonsmokers face health hazards from exposure to environmental tobacco smoke. * * * While smokers may be deemed to consent to the damage they inflict upon *646 themselves, the damage inflicted upon nonsmokers is involuntary. * * * The case against tobacco smoke has reached compelling proportions.”
Contemporaneous with the signing of Public Health Law article 13-E into law, the Governor issued a Memorandum of Approval for Laws of 1989 (ch 244, 1989 McKinney’s Session Laws of NY, at 2397), which again cited the 1986 Report of the Surgeon General:
“The overwhelming scientific evidence that secondhand smoke poses a grave danger to public health is not subject to serious dispute. In 1986, the Surgeon General concluded that second-hand smoke causes lung cancer in otherwise healthy nonsmokers, that the children of smoking parents suffer a higher incidence of respiratory infections, and smaller rates of increase in lung functions, and that the separation of smokers and non-smokers in the same airspace reduces, but does not eliminate, exposure to second-hand smoke.”[3] (Emphasis added.)
The court concludes that article 13-E of the Public Health Law declares ETS to be a public health risk. Because the 1986 Report of the Surgeon General was extensively relied upon by the New York State Legislature and the Governor, the court takes judicial notice of those specific facts and conclusions quoted above in the memorandum of approval.[4]
*647 Scholarly commentators disagree as to the evidentiary significance of taking judicial notice and whether or not a judicially noticed fact is final or can be disputed. There is no statute or definitive appellate case that clarifies this issue. The analysis by Professor Wigmore is applicable to judicial notice in a nonjury trial, such as the case at bar: “to judicially notice a matter, means merely that it is taken as true without the offering of evidence by the party who should ordinarily have done so * * * But the opponent is not prevented from disputing the matter of evidence if he believes it is disputable.” (9 Wigmore, Evidence § 2567 [3d ed 1940]; People ex rel. Domingo v French Bottling, 259 NY 4 [1932], affg 234 App Div 680 [1931].)
People ex rel. Domingo v French Bottling (supra at 7) is the clearest expression by the Court of Appeals of the law of judicial notice and, in dicta, subscribes to the notion that facts judicially noticed may be contradicted:
“In determining what saccharin is, the judge has a discretionary right to resort to standard dictionaries and encyclopedias to satisfy himself ‘that he is justified in making the desired ruling for dispensing with evidence.’ [I.e., taking judicial notice.] (5 Wigmore on Evidence [2d ed.], p. 574.) [Here the Court cites dictionary and encyclopedia definitions of‘saccharin’.] * * *
“While these definitions of saccharin are not conclusive on the fact, the People made out a prima facie case and the burden of going on passed to defendant to meet the evidence against it.”
The Court also agrees with Fisch, New York Evidence (§ 1070, at 607 [1977]): “It would seem, however, that a realistic view would acknowledge that matters judicially noticed may be only prima facie true, but that the high degree of probability warrants judicial notice of the proposition.”
A different view regarding the finality of judicially noticed facts is set forth in both Prince, Richardson on Evidence (§ 2-207 [Farrell 11th ed]) and rule 201 of the Federal Rules of Evidence.[5] Both sources maintain that judicial notice is dispos-itive of the issue noticed in civil jury trial. Both are silent as to *648 the finality of judicial notice in nonjury trials. The inherently more flexible format of a bench trial can and should provide the opportunity for refutation of facts proposed for judicial notice.
Some scholars distinguish judicially noticed facts as either legislative or adjudicative. Adjudicative facts are specific to the case; legislative facts are “those which have relevance to legal reasoning and the lawmaking process” (1972 Advisory Comm Notes, Fed Rules Evid rule 201). The facts set forth in footnote 4 of this decision and order are legislative facts, and many authors would maintain that, by virtue of that, they are not subject to refutation. (See Davis, Judicial Notice, 55 Colum L Rev 945; Davis, An Approach to Problems of Evidence in the Administrative Process, 55 Harv L Rev 364; see also 1972 Advisory Comm Notes, Fed Rules Evid rule 201.)
In this case, the legislative facts that are judicially noticed are based upon the state of medical literature as of 1989. It only makes sense that the plaintiff or any party be allowed to contest this factual finding. In the case at bar, therefore, justice and reason dictate that this court allow any party to produce new scientific knowledge that has been acquired since the Legislature adopted article 13-E of the Public Health Law in 1989. Indeed, the very language that the court relies upon sets forth that there is “a substantial body of research showing that breathing second-hand smoke is a significant health hazard for non-smokers.” The plaintiff has presented the court with at least one study published in a peer reviewed journal after 1989 that disputes the carcinogenic risk associated with exposure to secondhand smoke.
The Legislature in article 13-E of the Public Health Law has not in any way regulated or limited the conduct at issue in this case. Moreover, its finding in 1989 was couched in language (“there was a substantial body of research showing that breathing second-hand smoke is a significant health hazard for nonsmokers” [emphasis added]) which suggests the appropriateness of continuing scrutiny and consideration.
While it appears that the overwhelming body of medical literature supports the proposition that ETS is a carcinogen and a health risk, the existence of literature to the contrary published post-1989 (the date Public Health Law art 13-E was adopted) persuades this court that it should “leave open the *649 possibility of introducing evidence through regular channels in appropriate situations.”[6]
Based on the foregoing, this court sets forth the following directives. The plaintiff should be entitled to dispute the decade-old finding by the Legislature with subsequently developed scientific facts, but the plaintiff will have the burden of proof. The child, Nicholas, will not be required to make out a case or have the burden of proof regarding the matters judicially noticed in this decision. Nicholas will be required to further testify regarding whether or not he has been exposed to ETS. Any party seeking to assert other risks or injuries from ETS exposure will have the burden of proving that ETS causes other conditions not mentioned in footnote 4 of this decision and order. The party contesting the matters judicially noticed herein shall have the burden of proof and must demonstrate by a preponderance of the evidence that the matter judicially noticed is incorrect and that as a consequence it is not in the best interest of Nicholas to regulate his residential ETS exposure.
Each party shall have the burden of going forward and the burden of proof regarding their proposed permanent visitation and custody scheme for Nicholas regarding ETS exposure, mindful that the legal standard of proof is to demonstrate that their proposal is in the best interests of the child.
The court will not take judicial notice of any of the other matters set forth in its prior decision and interim order. It shall reserve on those items and any party seeking to propound those matters shall have the burden of proof.
Despite taking judicial notice of specific health risks associated with ETS, the court is unable to determine from the literature presented when a room or home that is the site of smoking ceases to be a risk once smoking in the room or home has stopped, and thus not amenable to judicial notice. The facts in this case are that the plaintiff is the smoker, but the child spends the majority of his time in the defendant’s home. Thus, what time duration should elapse between indoor cigarette use and the child’s presence to satisfy the health/safety concerns of the child/law guardian can only be established by an evidentiary hearing.[7] Given the literature presented by the *650 plaintiff, scientific knowledge on matters such as out-gassing of ETS components from furniture, walls, drapes, etc., are not at a level of indisputability as would permit the court to utilize judicial notice to render a final decision mandating an absolutely smoke-free environment in this mother’s home. The court continues to hold, pending a hearing, that the best interests of this child are served by limiting his exposure to ETS. The court does continue to require pendente lite that the child’s primary residence with the defendant must be smoke-free consistent with the scientific conclusions that were the basis of the adoption of article 13-E of the Public Health Law, because it is where the child Nicholas spends most of his time and as a consequence, the duration of exposure to and magnitude of risk from ETS by-products would be presumptively greater.
Pending a hearing or trial on this issue, the court will order the recommendation of the Law Guardian that plaintiff not smoke in her residence 24 hours prior to Nicholas’ scheduled presence.[7]
[8] If there is a visitation but it is not regularly scheduled, there shall be no nonsmoking requirement prior to his presence. Smoking in a motor vehicle by either party shall be prohibited only when Nicholas is present in that vehicle.

. The memorandum, undated, is page 14-17 of the legislative Bill Jacket and is labeled Governors Program Bill 1989.

. Both houses of the Legislature, in urging the Governor to sign this bill, made references to the general risk of secondhand smoke in all settings. State Senator Michael J. Tully, Chair of the Senate Health Committee, wrote to the Governor “[w]hen this bill was debated on the floor of the Senate, Senator Stafford eloquently stated that we live in a free country, and that people should be free not to have to breathe other people’s smoke. It is in this spirit that we strongly urge the Governor to approve this critical legislation.” Assemblyman Alexander B. Grannis, Chair of the Assembly Housing Committee wrote “For years, the U.S. Surgeon General and State Health Commissioner David Axelrod have been warning us of the deleterious health effects of smoking and the dangers of exposure to secondhand smoke, calling this one of the most important public health issues of our time. During this period, scientific evidence has been mounting steadily documenting the adverse health impact of passive, or sidestream, smoke, particularly for the most vulnerable segments of the population such as babies in útero, young children, the elderly and anyone suffering from respiratory disorders. This is not to mention the countless thousands of others who simply find breathing somebody else’s smoke an irritant or a nuisance.”

. It is noteworthy that certain articles submitted by the plaintiff support certain of these findings, to wit: Fontham, Environmental Tobacco Smoke and Lung Cancer in Nonsmoking Women: A Multicenter Study (271 JAMA No. 22 1752 [1994]) concludes that “women who were exposed [to ETS] during childhood had higher relative risk [of lung cancer] associated with adult-life ETS exposures than women without childhood exposure.” Clearing the Air: Asthma and Indoor Air Exposures, Committee on the Assessment of Asthma and Indoor Air, Division of Health Promotion and Disease Prevention, Institute of Medicine (2000): “There is sufficient evidence to conclude that there is an association between ETS exposure and the development of asthma in younger children.” (ES-6.)

. To reiterate those facts and conclusions of which this court takes judicial notice: “The overwhelming scientific evidence that second-hand smoke poses a grave danger to public health is not subject to serious dispute. In 1986, the Surgeon General concluded that second-hand smoke causes lung cancer in otherwise healthy non-smokers, that the children of smoking parents suffer a higher incidence of respiratory infections, and smaller rates of increase in lung functions, and that the separation of smokers and nonsmokers in the same airspace reduces, but does not eliminate, exposure to second-hand smoke.” (Governor’s Mem.)

. Federal Rules of Evidence rule 201 (g), judicial notice of adjudicative facts, requires a court in a civil proceeding to instruct a jury “to accept as conclusive any fact judicially noticed. In a criminal case, the court shall instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed.”

. 1972 Advisory Comm Notes, Fed Rules Evid rule 201; Borden’s Farm Prods. Co. v Baldwin, 293 US 194.

. This is distinguished from a situation where the child is resident with the smoker.

. An unresolved central issue to be determined at any hearing is when does ETS ad the components thereof that may cause risk dissipate. Some scientists maintain that ETS components attach to furniture, walls, drapes, and then break down or outgas over a period of time. There is no scientifically precise time over which this process occurs. The literature before the court does not establish exact parameters. The court is mindful of the time parameters of the tests conducted both by tobacco companies and other researchers. These studies attempted to evaluate the short- and long-term risk of tobacco smoke exposure. These studies evaluate the behavior of tobacco smoke over hours and not days and weeks. (Nelson, Effect of Ventilation and Sampling Time on Environmental Tobacco Smoke Component Ratios, R.J. Reynolds Tobacco Co., 26 Envtl Sci and Techn [No. 10] 1909 [1992]; Baker and Proctor, The Origins and Properties of Environmental Tobacco Smoke, 16 Envt Inti 231-245 [1990]; see also Repace, Risk Management of Passive Smoking at Work and at Home, 13 St. Louis U Pub L Rev 763 [1994].)